Catherine Kilduff (CA Bar No. 256331)
David Derrick (CA Bar No. 316745)
Julie Teel Simmonds (CA Bar No. 208282)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, St. #800
Oakland, CA 94612
Phone: (510) 844-7100
Facsimile: (510) 844-7150
ckilduff@biologicaldiversity.org
dderrick@biologicaldiversity.org
jteelsimmonds@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity
and Turtle Island Restoration Network*

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and TURTLE ISLAND RESTORATION NETWORK, non-profit organizations,<br><br>     Plaintiffs,<br><br>  v.<br><br>GINA RAIMONDO, U.S. Secretary of Commerce, and NATIONAL MARINE FISHERIES SERVICE,<br><br>     Defendants. | Case No. 23-<br><br><br>**COMPLAINT FOR DECLARATORY AND OTHER RELIEF** |

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

**INTRODUCTION**

1.       In this action, Plaintiffs Center for Biological Diversity and Turtle Island Restoration Network challenge a rule issued by Defendants Secretary of Commerce Gina Raimondo and the National Marine Fisheries Service's (collectively, "the Fisheries Service") under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801– 1891d, to open almost 2,000 square miles of leatherback sea turtle critical habitat to sablefish pot fishing. 88 Fed. Reg. 83,830–61 (Dec. 1, 2023) ("Reopening Rule"). By refusing to reinitiate consultation under the Endangered Species Act, 16 U.S.C. § 1536(a)(2), on the impacts of the Reopening Rule, the Fisheries Service is failing to ensure that the Washington/Oregon/California sablefish pot/trap fishery ("Pot Fishery") does not jeopardize the continued existence of leatherback sea turtles or destroy or adversely modify their designated critical habitat.

2.       If current population trends continue, the West Pacific leatherback may be effectively extinct within 20 years. In waters off the U.S. West Coast, leatherback sea turtles face numerous, ongoing threats including getting tangled up and killed in commercial pot gear. Sablefish pots sit on the bottom of the ocean and are connected to each other in approximately two-mile-long strings of 15 to 50 pots. The end of each of the strings is connected by a vertical line to a surface buoy.

3.       The Pot Fishery entangles leatherback sea turtles in the vertical lines connecting the pots to a surface buoy. When a leatherback sea turtle gets tangled in sablefish pot lines, it can no longer move, may be unable to reach the surface to breathe, and can drown while anchored in place by the fishing gear.

4.       The Fisheries Service is violating the law in several ways by continuing to authorize this Pot Fishery without reinitiating and completing consultation under the Endangered Species Act on its impacts to leatherbacks. The agency continues to rely on an inadequate and outdated biological opinion it issued in 2012 on continuing operations of the Pacific Coast Groundfish Fishery ("2012 Biological Opinion"). Reinitiation of consultation is required for three reasons.

5.       First, the Rule increases the risks of leatherback entanglements by allowing

dangerous vertical lines in nearly 2,000 square miles of leatherback critical habitat—areas the Fisheries Service has determined are essential for the species' survival—for the very first time. Some of these areas are in the leatherbacks' primary feeding habitat, including parts of the Cordell Bank, Greater Farallones, and Monterey Bay national marine sanctuaries. The decade-old biological opinion does not consider how the Pot Fishery's operation in the newly opened areas could adversely affect the species or its critical habitat.

6.     Second, the number of leatherbacks killed or injured in fishing gear has exceeded the level permitted in the incidental take statement in the existing biological opinion. Scientists have indicated that protection of every reproductive leatherback is critical to its continued existence.

7.     Third, new information on leatherback's declining abundance at nesting beaches and in California's waters indicates an increasing extinction risk and reveals that the Pot Fishery may be affecting leatherbacks in a manner and to an extent not previously considered.

8.     In sum, the Fisheries Service's ongoing failure to reinitiate consultation in the face of this information is unlawful, and puts leatherbacks at further risk of extinction.

9.     The Fisheries Service's continued reliance on the fundamentally flawed 2012 Biological Opinion violates the procedural requirement to reinitiate consultation and the agency's substantive duty to ensure its actions are not likely to jeopardize the continued existence of leatherback sea turtles. 16 U.S.C. § 1536(a)(2).

10.     The Fisheries Service violated the Magnuson-Stevens Fishery Conservation and Management Act and the Administrative Procedure Act by issuing the Reopening Rule in violation of the Endangered Species Act.

11.     Accordingly, Plaintiffs seek a declaration that the Fisheries Service's refusal to reinitiate and complete consultation on the impacts of the Pot Fishery violates the Endangered Species Act, the Magnuson-Stevens Fishery Conservation and Management Act, and the Administrative Procedure Act. Plaintiffs also seek an order requiring the Fisheries Service to complete consultation under the Endangered Species Act by a date certain and to issue interim

1  measures until consultation is complete to protect leatherback sea turtles from further unlawful
2  death, injury, and other harm due to the Fisheries Service's illegal actions and omissions.

3  **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

4      12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal
5  question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (action to
6  compel an officer of the United States to perform his or her duty); 28 U.S.C. §§ 2201–02 (power
7  to issue declaratory judgments and grant relief in cases of actual controversy); 16 U.S.C.
8  § 1540(g) (Endangered Species Act citizen suit provision); 16 U.S.C. § 1855(f) (review of
9  regulations promulgated under the Magnuson-Stevens Fishery Conservation and Management
10  Act); and 5 U.S.C. § 702 (Administrative Procedure Act).

11      13.     The requested relief is proper under 16 U.S.C. § 1540(g)(1); 16 U.S.C.
12  § 1855(f)(1); 28 U.S.C. §§ 2201, 2202, 1361; and 5 U.S.C. §§ 704, 706.

13      14.     Venue is proper in the Northern District of California pursuant to 16 U.S.C.
14  § 1540(g)(3)(A) because the violations are occurring in this district. Venue is also proper in this
15  district pursuant to 28 U.S.C. § 1391(e), as one or more Plaintiffs reside in this judicial district
16  and a substantial part of the events giving rise to the claims occurred here.

17      15.     Pursuant to Civil Local Rule 3-2(c) and 3-2(d), the appropriate intradistrict
18  assignment of this case is either the San Francisco or Oakland division.

19  **PARTIES**

20  **Plaintiffs**

21      16.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a national
22  nonprofit conservation organization that works through science, law, and policy to secure a
23  future for all species, great or small, hovering on the brink of extinction. The Center is dedicated
24  to the preservation, protection, and restoration of biodiversity and ecosystems throughout the
25  world.  The Center has more than 84,000 members. The Center brings this action on behalf of its
26  members.

27      17.     The Center's Oceans Program focuses specifically on conserving marine
28  ecosystems and seeks to ensure that imperiled species are properly protected from destructive

practices in our oceans. In pursuit of this mission, the Center has been actively involved in securing Endangered Species Act protections for imperiled sea turtles and protecting wildlife from deadly and harmful entanglements in commercial fishing gear.

18.     Center members live in and regularly visit ocean waters, bays, beaches, and other coastal areas to observe, photograph, study and otherwise enjoy leatherback sea turtles and their habitat. Center members have an interest in sea turtles and other wildlife and their Pacific Ocean habitat, including waters off California, Oregon, and Washington. For example, Center members frequently sail, kayak, and go on whale-watching tours in Gulf of the Farallones, Half Moon Bay, Monterey Bay, and the Santa Barbara Channel to look for and photograph whales, sea turtles, and other wildlife. Center members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from the presence of leatherback sea turtles and protection of their habitat. One Center member has gone on numerous whale-watching trips leaving from San Francisco, Monterey Bay and Long Beach hoping to see sea turtles, marine mammals, and seabirds. He went whale watching in Monterey Bay in early October 2023 and searched for leatherback sea turtles. He saw many humpback whales, killer whales, and birds. He enjoyed that trip but felt greatly troubled that leatherback sea turtles are threatened with extinction and rarely seen. He fears he may not have the chance of seeing them in the future. He and other Center members intend to continue to look for Pacific leatherback sea turtles and enjoy their habitat on an ongoing basis.

19.     Entanglements of leatherback sea turtles in the Pot Fishery kill animals that Center members enjoy viewing. The Fisheries Service's failure to comply with the Endangered Species Act makes it less likely that Center members will be able to observe, study, and enjoy these animals. Additionally, Center members reasonably fear that they will see a leatherback sea turtle entangled in fishing gear when recreating and visiting beaches and ocean waters of California, Oregon, and Washington.

20.     Plaintiff TURTLE ISLAND RESTORATION NETWORK ("Turtle Island") is a nonprofit 501(c)(3) corporation with its principal place of business in Olema, California. Turtle Island works through scientific research; legal and policy advocacy; education; and restoration

efforts to protect marine and riparian wildlife globally. Turtle Island is dedicated to the preservation, protection, and restoration of marine biodiversity, native species, and ecosystems. Turtle Island's approximately 160,000 supporters and members throughout the United States and the world share a commitment to the study, protection, enhancement, conservation, and preservation of the world's marine and terrestrial ecosystems, including protection of sea turtles and marine mammals.

21.     Turtle Island has devoted considerable resources to studying and communicating the threats to a wide range of threatened and endangered marine species. For example, Turtle Island has actively advocated on all levels to protect leatherback and loggerhead sea turtles and other species from both the use of harmful fishing gear and attempts to ramp up fishery efforts. Turtle Island played a crucial role in having the Pacific Leatherback as California's declared California's official "State Marine Reptile."  Turtle Island provides grant funding and support for protection of nesting beaches in Papua New Guinea and Costa Rica.

22.     Turtle Island's members have researched, studied, observed, and sought protection for many federally listed threatened and endangered species, including leatherback and loggerhead sea turtles. Turtle Island's members regularly use, and plan to continue to use, waters of the Pacific Ocean and its wildlife for observation, research, aesthetic enjoyment, and other recreational, scientific, and educational activities. Turtle Island's members derive educational, scientific, recreational, conservation, spiritual, commercial, and aesthetic benefits from observing, photographing, producing film documentaries, and providing naturalist-led interpretive activities to view leatherback sea turtles, marine mammals, and other marine species in the wild. Turtle Island brings this action on behalf of its members.

23.     An integral aspect of the Plaintiffs' members' use and enjoyment of leatherback sea turtles is the expectation and knowledge that the species are in their native habitat. For this reason, Plaintiffs' use and enjoyment of sea turtles is entirely dependent on the continued existence of healthy, sustainable populations in the habitat off the Pacific Coast. The Fisheries Service's failure to comply with applicable environmental laws deprives sea turtles of statutory protections that are vitally important to the species' survival and eventual recovery. The

Fisheries Service's failure to reinitiate consultation under the Endangered Species Act and complete an adequate biological opinion diminishes the aesthetic, recreational, spiritual, scientific, and other interests of Plaintiffs and their members because leatherback sea turtles are more vulnerable to harm and less likely recover. Plaintiffs are therefore injured because Plaintiffs' use and enjoyment of the sea turtles, and those areas inhabited by them, are threatened by the Fisheries Service's issuance of the Reopening Rule without compliance with those environmental laws.

24.    The above-described cultural, spiritual, aesthetic, recreational, scientific, educational, and other interests of Plaintiffs have been, are being, and, unless the relief prayed herein is granted, will continue to be adversely affected and irreparably injured by the Fisheries Service's continued refusal to comply with obligations under the Endangered Species Act, the Magnuson-Stevens Fishery Conservation and Management Act, and other laws. The relief sought in this case will redress these injuries.

25.    In addition, Plaintiffs' members regularly comment on agency actions that affect wildlife off the West Coast, including leatherback sea turtles, and regularly comment on and participate in the Fisheries Service's decisions affecting threatened and endangered species. Rules regarding fishing, the routing of ship traffic, the management of national marine sanctuaries, and offshore energy development all have the potential to impact leatherback sea turtles. The Fisheries Service's failure to comply with the Endangered Species Act and Magnuson-Stevens Fishery Conservation and Management Act, specifically by failing to ensure against jeopardy and adverse modification and by failing to adequately assess the impact of the Pot Fishery, deprives Plaintiffs' members of these rights to understand and comment on the impacts of agency activities on leatherback sea turtles, and causes them informational injuries that would be redressed by a favorable decision.

**Defendants**

26.    Defendant GINA RAIMONDO, U.S. Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has responsibility for its administration and implementation of the Endangered Species Act and the Magnuson-Stevens

Fishery Conservation and Management Act, and for compliance with all other federal laws applicable to the Department of Commerce. She is sued in her official capacity.

27.     Defendant NATIONAL MARINE FISHERIES SERVICE is an agency within the Department of Commerce. The National Marine Fisheries Service is the agency that implements the Endangered Species Act and the Magnuson-Stevens Fishery Conservation and Management Act.

**LEGAL BACKGROUND**

**Endangered Species Act**

28.     With the Endangered Species Act, Congress intended endangered species to be afforded the highest of priorities. The Endangered Species Act's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

29.     Under the Endangered Species Act, conservation means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." *Id.* § 1532(3).

30.     To receive the full protections of the Endangered Species Act, a species must first be listed by the Secretary of the Commerce, through the Fisheries Service, as "endangered" or "threatened." *Id.* at § 1533. The Endangered Species Act defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

31.     Recognizing the importance of timely habitat protections to the conservation and recovery of endangered species, the Endangered Species Act requires the designation of critical habitat concurrently with listing a species. *Id.* § 1533(a)(3)(A)(i); *see also id.* § 1533(b)(6)(C). Habitat designated as critical habitat is essential to the species' survival and recovery. *Id.*

§ 1532(5).

32.     The Endangered Species Act generally prohibits any person, including both private persons and federal agencies, from "taking" any endangered species. 16 U.S.C. § 1538(a)(1). The Endangered Species Act defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19).

33.     Once a species is listed and critical habitat is designated, Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), establishes a critical component of the statutory scheme to conserve endangered and threatened species. It requires that every federal agency determine whether its actions "may affect" any endangered or threatened species. If so, the action agency must typically formally consult with the Fisheries Service as part of its duty to "insure that [its] action is . . . not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" habitat that has been designated as critical for such species. *Id*. § 1536(a)(1), (2); 50 C.F.R. § 402.14 (2019).

34.     The term "jeopardize" is defined as an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (2019).  Recovery is defined as "improvement in the status of listed species to the point at which listing is no longer appropriate." *Id.*

35.     "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

36.     At the completion of formal consultation, the Fisheries Service issues a biological opinion that determines if the agency action is likely to jeopardize the species or adversely modify its critical habitat. 16 U.S.C. § 1536(b)(3)–(4); 50 C.F.R. § 402.14(h) (2019).

37.     In forming its biological opinion, the Fisheries Service must consider the "current status . . . of the listed species or critical habitat;" the "effects of the action;" and the "cumulative effects." 50 C.F.R. § 402.14(g)(2)–(4) (2019). In doing so, it may only use "the best scientific

1    and commercial data available." 16 U.S.C. § 1536(a)(2).

2        38.    "Effects of the action" include "all consequences to listed species or critical

3    habitat" from a proposed action. 50 C.F.R. § 402.02 (2019). The "environmental baseline"

4    includes "the past and present impacts of all Federal, State, or private actions and other human

5    activities in the action area, the anticipated impacts of all proposed Federal projects in the action

6    area that have already undergone formal or early section 7 consultation, and the impact of State

7    or private actions which are contemporaneous with the consultation in process." *Id*. "Cumulative

8    effects" include "future State or private activities, not involving Federal activities, that are

9    reasonably certain to occur within the action area." *Id.*

10        39.    Thus, in issuing a biological opinion, the Fisheries Service must consider not just

11    its isolated share of responsibility for impacts to the species traceable to the activity that is the

12    subject of the biological opinion, but also the effects of that action when added to all other

13    activities and influences affecting that species.

14        40.    After the Fisheries Service has added the direct and indirect effects of the action

15    to the environmental baseline and cumulative effects, it must make its determination of whether

16    the action is likely to jeopardize the continued existence of a listed species or result in the

17    destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3), (b)(4); 50 C.F.R.

18    § 402.14(h) (2019).

19        41.    A biological opinion that concludes an agency action is not likely to jeopardize

20    the continued existence of a listed species but is reasonably certain to result in take incidental to

21    the agency action must include an incidental take statement. 16 U.S.C. § 1536(b)(4).

22        42.    The take of a listed species in compliance with the terms of a valid incidental take

23    statement is not prohibited under section 9 of the Endangered Species Act. *Id*. § 1536(o)(2); 50

24    C.F.R. § 402.14(i)(5) (2019).

25        43.    The incidental take statement must specify the amount or extent of incidental

26    taking on such listed species, "reasonable and prudent measures" that the Fisheries Service

27    considers necessary or appropriate to minimize such impact and set forth "terms and conditions"

28    that must be complied with by the action agency to implement the reasonable and prudent

COMPLAINT FOR DECLARATORY AND OTHER RELIEF                                9

measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i) (2019).

44.     If the Fisheries Service determines in its biological opinion that the action is likely to jeopardize the continued existence of a listed species, the biological opinion must include "reasonable and prudent alternatives" to the action that will avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2) (2019).

45.     Regardless of the conclusion reached in the biological opinion, the agency undertaking the federal action has an independent duty to ensure that its actions are not likely to jeopardize the continued existence of listed species or adversely modify their designated critical habitat. 16 U.S.C. § 1536(a)(2). An agency's reliance on a legally flawed biological opinion to authorize an action does not satisfy its substantive duty to prevent jeopardy.

46.     The Endangered Species Act specifies that Section 7 consultations must typically be completed within ninety days after initiation. 16 U.S.C. § 1536(b)(1); 50 C.F.R. § 402.14(e) (2019). The substantive duty to ensure against jeopardy of listed species and adverse modification of critical habitat remains in effect regardless of the status of the consultation.

**Magnuson-Stevens Fishery Conservation and Management Act**

47.     The Magnuson-Stevens Act governs fishing by U.S. vessels. 16 U.S.C. § 1801.

48.     The Magnuson-Stevens Act accomplishes this, in part, through Regional Fishery Management Councils, which propose Fishery Management Plans ("Plans") and Plan amendments to regulate fishing within their region. 16 U.S.C. § 1852(h)(1). The Fisheries Service must approve each Plan or Plan amendment before it takes effect. *See id*. § 1854(a). The Fisheries Service may approve a Plan or Plan amendment only if it is consistent with applicable laws, including the Endangered Species Act. *Id*. §§ 1853(a)(1)(C), 1854(a)(1)(A), (3).

49.     The Magnuson-Stevens Act provides for judicial review of the Fisheries Service's actions implementing a fishery management plan. 16 U.S.C. § 1855(f).

**Administrative Procedure Act**

50.     The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, provides for judicial review of final agency action. Under the APA, a person may seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1). Additionally,

COMPLAINT FOR DECLARATORY AND OTHER RELIEF                    10

1   the APA requires that a reviewing court "hold unlawful and set aside agency action, findings,

2   and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

3   accordance with law." *Id*. § 706(2)(A).

### FACTUAL AND PROCEDURAL BACKGROUND

#### Imperiled Leatherback Sea Turtles



Credit: National Marine Fisheries Service

51.   The Fisheries Service listed the leatherback sea turtle as endangered throughout

its range in 1970. 50 C.F.R. § 224.101(h) (1970). The agency designated its critical habitat on

September 26, 1978 (43 Fed. Reg. 43,688), revised that designation on March 23, 1979 (44 Fed.

Reg. 17,710), and expanded the designation in 2012 to add waters off the U.S. West Coast. 50

C.F.R. § 226.207 (2012).

52.   The Fisheries Service completed a comprehensive status review of leatherback

sea turtles in 2020. 85 Fed. Reg. 48,332 (Aug. 10, 2020). The Fisheries Service did not propose

changes to the existing global listing of leatherback sea turtles as endangered. *Id.* However, it

found that seven populations would meet the discreteness and significance criteria for

recognition as distinct population segments under the Endangered Species Act. *Id.*

53.   One of those populations, the West Pacific leatherback sea turtle, includes

individuals that migrate from nesting beaches in Indonesia, Papua New Guinea, and the Solomon

Islands to forage in the eastern Pacific Ocean, including in waters off the U.S. West Coast.

Approximately 38 to 57 percent of West Pacific leatherback sea turtles migrate to West Coast foraging grounds, including Central California waters.

54.     Juvenile West Pacific leatherback sea turtles may swim thousands of miles searching for abundant food sources, such as those in the central California ecoregion. The West Pacific leatherback sea turtles that migrate to the eastern Pacific may forage there seasonally for a few years before returning to nest.

55.     As of 2017, the nesting female abundance of the West Pacific leatherbacks was just 1,053 nesting females (or 1,442 adults based on a 73 percent female-biased sex ratio). This places these leatherbacks "at risk for environmental variation, genetic complications, demographic stochasticity, negative ecological feedback, and catastrophes." 85 Fed. Reg. at 48,389 (status review). The West Pacific leatherback's small population size is a major factor in its extinction risk. *Id.*

56.     From 1984 to 2011, West Pacific leatherback sea turtle's population declined by as much as 78.3 percent. *Id*. at 48,390. West Pacific leatherbacks' abundance has been declining about six percent annually through 2017. *Id.*

57.     Assuming the decline of six percent per year continues, the Fisheries Service's 2020 population trend model predicts that West Pacific leatherbacks will decline to 50 percent of their 2017 abundance in about 10 years (starting in 2021) and to 25 percent in about 20 years. In other words, the West Pacific leatherback sea turtle population will decline by 75 percent between the years 2021 and 2041, or 263 nesting females (or 334 adults based on a 73 percent female-biased sex ratio). At that point it will be difficult if not impossible for the leatherback to avoid extinction. The 2020 model's projected decline is the best available data.

58.     Fisheries Service scientists have estimated that mortality of leatherbacks off the U.S. West Coast must be kept to fewer than one death every six years to avoid delaying the population's recovery.

59.     Consistent with this declining trend, leatherback abundance off central California declined 5.6 percent annually over 28 years, which corresponds to an overall decline of 80 percent. *Id*. at 48,390. From 1990 to 2003, the average estimate of leatherbacks foraging off

central California was 128. From 2004 to 2017, the average number dropped to 55. Leatherbacks foraging off central California are adults or sub-adults.

60.     The primary threat to leatherback sea turtles globally is legal and illegal harvest of turtles and eggs. *Id.* at 48,392. Abundance and productivity are further reduced by coastal and open-ocean fisheries, internationally and in the United States. Other threats include vessel strikes, pollution, and natural disasters. Climate change is an increasing threat.

61.     Loss of West Pacific leatherback sea turtles would result in a significant gap in the range of leatherback sea turtles as a species. The potential for its imminent extinction warrants extreme caution in assessing impacts of fisheries entanglements and authorizing fishing activities.

62.     The Fisheries Service identified prey—specifically jellyfish and other gelatinous animals—of "sufficient condition, distribution, diversity, abundance and density necessary to support individual as well as population growth, reproduction, and development of leatherbacks" as the primary constituent element of critical habitat. 50 C.F.R. § 226.207(b)(4) (2012). The designated critical habitat included three specific geographic areas that met the definition of critical habitat and had conservation benefits to the species that outweighed the benefits of excluding those areas.

63.     The three specific geographic areas designated are used regularly for foraging and are identified in order of higher to lower conservation value:

Area 1: The waters south of Point Arena to Point Sur, California, extending offshore to the 200-meter depth contour. This area is a principal California foraging area characterized by high densities of primary prey species.

Area 2: The waters between Cape Flattery, Washington, and Cape Blanco, Oregon, extending offshore to the 2000-meter isobath. This area is the principal Oregon/Washington foraging area and includes important habitat associated with the Columbia River Plume, and Heceta Bank, Oregon.

Area 7: The waters offshore from Point Arena to Point Sur, California (i.e., between the 200–3000 meter depth contours), and waters between the coastline and the 3000 meter

depth contour from Point Sur to Point Arguello, California. Leatherbacks commonly utilize these offshore waters when jellyfish availability in Area 1 is poor and as a region of passage to and from Area 1. The southern portion of the region includes Morro and Avila bays, where large densities of brown sea nettles have been observed seasonally. 77 Fed. Reg. 4170, 4,189–90 (Jan. 26, 2012).

64.     While all three of these areas scored a high conservation value—consistent with scientific literature and observations of a high level of leatherback foraging in these areas—Area 1 was the only area given the highest score for prey density and prey aggregating mechanism and thus scored higher than the other two areas. 77 Fed. Reg. at 4,193. Area 1 is also the smallest of the three areas, encompassing 3,807 square miles. *Id*. at 4,192 (Table 1).

65.     The Fisheries Service chose Pacific leatherback sea turtles as one of just ten "Species in the Spotlight," which are among the most at-risk of extinction.

### The Pot Fishery

66.     The Fisheries Service implements the Pacific Coast Groundfish Fishery Management Plan, 50 C.F.R. § 660.10 (2010), which uses measures like quotas, area restrictions, and gear specifications to manage over 100 different species that primarily live on or near the ocean bottom. Sablefish are one of six species of "groundfish" covered in the Plan.

67.     The Washington/Oregon/California Pot Fishery uses pots (or traps), heavy-duty fishing line, and buoys. The gear is configured so that multiple heavy pots are linked along the seafloor, with ends marked at the surface by one or more buoys attached to a line that runs through the water column. The pots can weigh hundreds of pounds.

68.     Approximately 155 vessels fish in the Pot Fishery off Washington, Oregon, and California. From 2015 to 2019, those vessels fished an annual average of approximately 75,000 pots.

69.     Landings indicate that concentrated fishing areas exist off Astoria, Oregon; Newport, Oregon; Fort Bragg, California, and San Francisco, California. While fishing occurs year-round, landings of groundfish in the Pot Fishery are highest from May through December. This overlaps with West Pacific leatherback's seasonal migration to feed off the West Coast

because the leatherbacks arrive in spring. Central California is the principal foraging grounds for West Pacific leatherback sea turtles, so fishing in this area at this time increases the Pot Fishery's risk of entanglements.

70.     Various threats exist where the Pot Fishery operates. Leatherbacks have been entangled in coastal pot/trap fisheries and the California drift gillnet fishery, killed by vessel strikes, entrained in power plants, and taken through scientific research. The most recent documented mortality occurred on November 24, 2023, when a leatherback sea turtle was found dead, entangled in a lost or abandoned commercial California Dungeness crab pot.

71.     In 2020, the Fisheries Service said the California Dungeness crab pot fishery may be a newly emerging threat to leatherback sea turtles. 85 Fed. Reg. at 48,397. Leatherback entanglements in the California Dungeness crab pot fishery were documented in 2015, 2016, and 2023. One dead leatherback was found in 2018 floating in pot fishing gear for rock crabs.

72.     Some vessels fish in both the Dungeness crab pot fishery and the sablefish Pot Fishery. For example, some of the same vessels fished in both the Pot Fishery and the Dungeness crab pot fishery in 2015 and 2016, the years when leatherback sea turtles were entangled in Dungeness crab gear. The Dungeness crab fishery closure in 2016, due to naturally occurring toxins, caused additional vessels from the Dungeness crab fishery to switch to the Pot Fishery for that season.

73.     Entanglement reports are opportunistic and are likely biased towards areas of higher human populations and areas where leatherback sea turtles are closer to shore. Most pot fishing vessels, like those used in the California Dungeness crab pot fishery, do not have wildlife observers onboard. Others, including the Pot Fishery, have observers on a very low percentage of the vessels. The Fisheries Service has not required gear marking to identify the Pot Fishery's gear if it is lost or abandoned.

*The Pot Fishery's Leatherback Sea Turtle Entanglements*

74.     The 2012 Biological Opinion assesses the effects of the Pot Fishery on endangered leatherback sea turtles and their critical habitat as well as on other endangered and threatened species. The 2012 Biological Opinion defines the agency action as the Fisheries

1  Service's continuing implementation of the Pacific Coast Groundfish Fishery Management Plan.

2      75.    The 2012 Biological Opinion found that the Pot Fishery's take of leatherback sea

3  turtles would be ongoing due to its continued operation. It anticipated the Pot Fishery would

4  injure or kill 1.9 leatherback sea turtles over five years (or 0.38 leatherback sea turtles annually).

5      76.    The 2012 Biological Opinion calculated this estimated take of leatherback sea

6  turtles by including in its calculations the interactions observed in the Pot Fishery and those

7  attributable to unidentifiable fishing gear. The Fisheries Service wrote that there "is uncertainty

8  about the number of past entanglements attributed to the [Pot Fishery], because most of the

9  fishing effort identified as an entanglement risk was not observed . . . [and] entanglements

10  reported through stranding networks could not be attributed to specific fisheries." 2012

11  Biological Opinion at 104. The Fisheries Service's analysis included one leatherback mortality

12  observed in 2008 from the Pot Fishery and two leatherback sea turtles entangled in gear that

13  could not be attributed to a specific fishery, resulting in an annual average of 0.38 leatherback

14  takes between 2002 and 2010.

15      77.    Consistent with this method, the 2012 Biological Opinion's incidental take

16  statement specifies that "unidentified gear entanglements reported to stranding networks would

17  be counted against these take limits in addition to known leatherback sea turtle entanglements in

18  gear of" the Pot Fishery, until minimum observer coverage levels are achieved. *Id.* at 123. The

19  2012 Biological Opinion does not identify minimum observer coverage levels.

20      78.    The Fisheries Service has said that it plans to maintain historical wildlife observer

21  rates in the Pot Fishery, which is 3–12 percent of all the landings. It also said that due to this low

22  observer coverage, conclusive statements about leatherback turtle bycatch cannot be made

23  without more data on the overlap between the Pot Fishery and leatherback sea turtles.

24      79.    During the period 2015 to 2019, the Pot Fishery exceeded the 2012 Biological

25  Opinion's incidental take statement's limit of 0.38 leatherback sea turtles per year. The Fisheries

26  Service reported leatherback sea turtle strandings in 2015 and 2019 that had evidence of fishery

27  interactions. These two incidents result in an annual average take of 0.40 leatherback sea turtles

28  over five years. Three more strandings were attributed to crab pot fisheries in this period. In

COMPLAINT FOR DECLARATORY AND OTHER RELIEF                                    16

contrast, the 2012 Biological Opinion reported three leatherback sea turtles in pot gear in California reported from 2001 to 2008, a nine-year period.

80.    More entanglements in pot fishing gear combined with a declining West Pacific leatherback abundance means the impact of pot fishing gear on the leatherback's extinction risk is higher than the Fisheries Service analyzed in its 2012 Biological Opinion.

**The Reopening Rule Increases Entanglement Risk and Adversely Modifies Critical Habitat**

81.    On December 1, 2023, the Fisheries Service published a final rule implementing regulations for Amendment 32 to the Pacific Coast Groundfish Fishery Management Plan ("Reopening Rule") that will open almost 2,000 square miles of leatherback sea turtle critical habitat to the Pot Fishery. 88 Fed. Reg. at 83,830. The Reopening Rule specifically allows non-trawl fishing gear—including sablefish pot gear—into parts of the Non-Trawl Rockfish Conservation Area ("Conservation Area") that have been closed since the early 2000s to protect overfished rockfish, which are a type of groundfish. The Reopening Rule created smaller areas that will remain closed to continue protecting vulnerable fish species, as well as to protect critical groundfish habitats like rocky reefs, corals, and sponges.

82.    The Reopening Rule generally allows fishing closer to shore, specifically allowing fishing to a boundary that approximates a depth contour of 137 meters (75 fathoms). The previous boundary followed either the 183-meter contour off Oregon, or the 183-meter or 229-meter contour off California, depending on the latitude. No change in the Conservation Areas' boundaries was made in waters off Washington or in the Southern California Bight, an area spanning from Point Conception in Santa Barbara County to just south of San Diego.

83.    The Reopening Rule opens to the Pot Fishery approximately 2,414 square miles of waters off California and Oregon, 1,942 square miles of which overlap with leatherback critical habitat. The Pot Fishery's operation over a larger area of leatherback critical habitat increases the risk of leatherback entanglement and adversely modifies the critical habitat by lowering its conservation value.

84.    The Pot Fishery can obstruct the leatherback sea turtles' movement and thereby prevent or impede prey consumption. The Fisheries Service designated critical habitat for

leatherbacks in this area because of the availability of prey and the likelihood that leatherback sea turtles would be foraging in this area. Opening this habitat to the Pot Fishery increases the risk of leatherback entanglements.

85.    It also destroys and adversely modifies the designated critical habitat itself and diminishes its value for leatherback conservation. The occurrence of prey items of sufficient quality necessary to support "growth, reproduction, and development of leatherbacks" is the primary constituent element of critical habitat. 50 C.F.R. § 206.227(b)(4). If those prey items are less accessible or inaccessible because of fishing gear, it diminishes the value of the critical habitat. The distribution, diversity, abundance, and density of the prey items may not be sufficient to support leatherback growth, reproduction, and development if the Pot Fishery is coextensive with designated critical habitat.

86.    In the *Federal Register* notice for the Reopening Rule, the Fisheries Service determined there are no anticipated impacts on endangered leatherback sea turtles beyond those already considered in the 2012 Biological Opinion and therefore re-initiation is not warranted. 88 Fed. Reg. at 83,837. The Fisheries Service further said that it is not aware of any information that allowing the Pot Fishery in coastal waters "would create more potential for sea turtle interactions compared to fishing in" deeper waters, or in other words, than fishing beyond the previous Conservation Areas' 183- or 229- meter boundary. *Id.*

87.    Yet the Fisheries Service explicitly designated California's leatherback critical habitat into two areas on either side of the 200-meter-depth contour. *See* 50 C.F.R. § 226.207(b)(1). This indicates that the 200-meter-depth contour is an important line for leatherback sea turtles. The coastal, nearshore waters of Area 1 are "the principal foraging area off the coast of California." 77 Fed. Reg. at 4,189. The offshore waters, while essential to the conservation of the species, have a lower conservation value compared to the coastal waters. *Id.* at 4,193 (Table 2 (comparing Area 1 to Area 7)).

88.    The Reopening Rule's boundary change in California's leatherback critical habitat allows the Pot Fishery to set pots in 407 square miles of the leatherback's principal feeding area. *See* Figure 1 below. This increases the risk of leatherback entanglement, injury, and death and

adversely modifies its critical habitat.



Figure 1. Leatherback sea turtle critical habitat in California consists of Area 1 in orange, the principal feeding area, and Area 7 in yellow, the secondary feeding area. The cross-hatch indicates Conservation Areas the Fisheries Service reopened to sablefish pot fishing.

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of the Endangered Species Act
### (Failure to reinitiate and complete consultation)

89.     Paragraphs 1 through 88 are hereby realleged as though set out in full.

90.     The Fisheries Service retains ongoing discretionary control and involvement over the Pot Fishery. The Fisheries Service's authorization, permitting, oversight, and management of the Pot Fishery, including issuing the Reopening Rule, constitute agency "action" that trigger consultation under Section 7 of the Endangered Species Act. 16 U.S.C. § 1536; 50 C.F.R. §§ 402.02 (2019), 402.03 (2009).

91.     The Fisheries Service's 2012 Biological Opinion and incidental take statement for leatherback sea turtles are no longer valid the reasons explained herein, including:

-   that the Reopening Rule increases the risk of leatherback entanglements and destroys or adversely modifies leatherback critical habitat in a way that was not considered in the 2012 Biological Opinion. 50 C.F.R. § 402.16 (2019);

-   that from 2015 to 2019 the amount of leatherback sea turtles entangled exceeded the incidental take statement's limit; and

-   new information—including that the leatherback abundance off the West Coast has declined almost six percent annually from 1990 to 2017—shows the effects of the action may affect leatherback sea turtles and their critical habitat in a manner or to an extent not previously considered.

92.     The Fisheries Service has failed to reinitiate and complete consultation on the impacts of the Pot Fishery and the Reopening Rule on Pacific leatherback sea turtles and their designated critical habitat. This violates Section 7(a)(2) of the Endangered Species Act and its implementing regulations. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14 (2019), 402.16 (2019).

93.     The Fisheries Service's refusal to reinitiate and complete consultation on the impacts of the Pot Fishery and Reopening Rule on Pacific leatherback sea turtles and their critical habitat constitutes arbitrary and capricious agency action, agency action "unlawfully

withheld or unreasonably delayed," and agency action made "without observance of procedure required by law" under the Administrative Procedure Act. 5 U.S.C. § 706(1), (2)(A), (2)(D).

## SECOND CLAIM FOR RELIEF

### Violation of the Endangered Species Act and Administrative Procedure Act (Unlawful Reliance on 2012 Biological Opinion)

94.     Paragraphs 1 through 88 are hereby realleged as though set out in full.

95.     The Fisheries Service has a duty as the action agency authorizing and managing the Pot Fishery to ensure that its actions are not likely to jeopardize the continued existence of any listed species, including endangered leatherback sea turtles, or result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. §1536(a)(2).

96.     The Fisheries Service cannot rely on the outdated 2012 Biological Opinion to meet its duty to ensure that its authorization and management of the Pot Fishery, including issuance of the Reopening Rule, will not jeopardize the continued existence of leatherback sea turtles or result in the destruction or adverse modification of their critical habitat.

97.     The Fisheries Service's continued authorization and management of the Pot Fishery based on the 2012 Biological Opinion violates Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), and reliance on the 2012 Biological Opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with law, contrary to the Administrative Procedure Act, 5 U.S.C. § 706(2).

## THIRD CLAIM FOR RELIEF

### Violations of the Magnuson-Stevens Fishery Conservation and Management Act and Administrative Procedure Act (Unlawful Issuance of the Reopening Rule)

98.     Paragraphs 1 through 88 are hereby realleged as though set out in full.

99.     The Reopening Rule opening approximately 2,411 square miles to the Pot Fishery is a final agency action within the meaning of the Administrative Procedure Act.

100.    For the reasons set forth above, the Reopening Rule is not consistent with applicable law. The Fisheries Service's decision to finalize and promulgate the Reopening Rule despite its inconsistency with applicable law exceeds its authority under the Magnuson-Stevens

Fishery Conservation and Management Act and is arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

**REQUEST FOR RELIEF**

For the reasons stated above, Plaintiffs respectfully request that the Court:

1.     Declare that the Fisheries Service has violated and is violating the Endangered Species Act, its implementing regulations, and the Administrative Procedure Act by failing to reinitiate and complete consultation on the Pot Fishery's Reopening Rule;

2.     Declare that the Fisheries Service is in violation of its Endangered Species Act Section 7(a)(2), 16 U.S.C. § 1536(a)(2), duty to ensure that the agency's continued authorization and management of the Pot Fishery is not likely to jeopardize the continued existence of leatherback sea turtles or destroy or adversely modify their critical habitat;

3.     Declare that the Fisheries Service has violated and is violating the Magnuson-Stevens Fishery Conservation and Management Act and the Administrative Procedure Act by issuing the Reopening Rule;

4.      Vacate and set aside the Reopening Rule's provisions that open approximately 2,411 square miles to the Pot Fishery under the Magnuson-Stevenson Fishery Conservation and Management Act;

5.     Order Defendants to complete an Endangered Species Act consultation and issue a new, legally valid biological opinion for leatherback sea turtles within 90 days;

6.     Issue any appropriate injunctive relief, including ordering Defendants to implement mitigation measures to reduce the Pot Fishery's impacts to leatherback sea turtles and their critical habitat pending completion of consultation;

7.     Award Plaintiffs their litigation costs, including reasonable attorneys' fees; and

8.     Provide such other relief as the Court deems just and proper.

DATE: December 28, 2023                    Respectfully Submitted,

                                           _/s/ Catherine Kilduff_____
                                           Catherine W. Kilduff (CA Bar No. 256331)
                                           David Derrick (CA Bar No. 316745)
                                           Julie Teel Simmonds (CA Bar No. 208282)
                                           CENTER FOR BIOLOGICAL DIVERSITY
                                           1212 Broadway, Ste. #800
                                           Oakland, CA 94612
                                           Phone: (510) 844-7100
                                           Facsimile: (510) 844-7150
                                           ckilduff@biologicaldiversity.org
                                           dderrick@biologicaldiversity.org
                                           jteelsimmonds@biologicaldiversity.org

                                           *Attorneys for Plaintiffs Center for Biological*
                                           *Diversity and Turtle Island Restoration Network*