TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
S. JAY GOVINDAN, Section Chief
MEREDITH L. FLAX, Deputy Section Chief
ANTHONY D. ORTIZ, Trial Attorney (DC Bar 978873)
JOSEPH W. CRUSHAM, Trial Attorney (CA Bar 324764)
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel | (202) 307-1147 (Ortiz)
Tel | (202) 307-1145 (Crusham)
Fax | (202) 305-0275
E-mails: Anthony.D.Ortiz@usdoj.gov
          joseph.crusham@usdoj.gov
Attorneys for Federal Defendants

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and TURTLE ISLAND RESTORATION NETWORK, <br><br> Plaintiffs, <br><br> v. <br><br> GINA RAIMONDO, in her official capacity as Secretary of Commerce, and the NATIONAL MARINE FISHERIES SERVICE, <br><br> Defendants. | Case No.:  3:23-cv-06642-AMO <br><br> **FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT** <br><br> Date:  November 25, 2024 <br> Time: 2:00 p.m. <br> Courtroom 10 <br> Judge Araceli Martínez-Olguín |

## NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE that, under Civil Local Rule 7-2, on November 25, 2024, at 2:00 p.m. or as soon thereafter as the Court's schedule permits, before Judge Araceli Martínez-Olguín, the United States will and hereby does move the Court to issue an order granting judgment in favor of the National Marine Fisheries Service ("NMFS"), and denying Plaintiffs' Motion for Summary Judgment (ECF No. 46) ("Pls.' Br.").

The United States seeks an order of the Court granting summary judgment in favor of Federal Defendants for Claim Three of Plaintiffs' Complaint (ECF No. 1) and denying the relief sought in Plaintiffs' Motion. This Cross-Motion is made on the grounds that NMFS complied with the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801 *et seq*.

This Cross-Motion is brought under Federal Rule of Civil Procedure 56 and is to be reviewed and resolved on the basis of the administrative record. Because NMFS's decision is rational, fully supported by its underlying administrative record, and otherwise complies with the law, NMFS is entitled to judgment as a matter of law.

This Cross-Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the NMFS administrative record filed with the Court, all of the pleadings, filings, and records in this matter, all other matters of which the Court may take judicial notice, and on such other and further arguments, documents, and grounds NMFS advances in this matter.

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES.................................................................................. 1

STATUTORY AND REGULATORY BACKGROUND........................................... 2

  A.  Endangered Species Act ............................................................................... 2

    1.  Consultation and Reinitiation of Consultation.................................... 2

  B.  Magnuson-Stevens Fishery Conservation and Management Act ....................... 3

FACTUAL BACKGROUND..................................................................................... 4

STANDARD OF REVIEW ....................................................................................... 8

ARGUMENT ............................................................................................................. 9

  A.  Because reinitiation of consultation has commenced and will be completed shortly, Plaintiffs' remaining claim is moot.......................................................... 9

  B.  NMFS complied with the MSA and the ESA in issuing the Final Rule.......................... 10

  C.  NMFS complied with the MSA and ESA in determining that Amendment 32 did not require reinitiation of consultation for the leatherback sea turtle or its critical habitat because there were no anticipated impacts of Amendment 32 beyond those considered in te 2012 BiOp. ............................................................ 11

    1.  NMFS considered the geographic expansion from Amendment 32 of the area in which sablefish pot gear fishing is allowed to occur............................................. 12

  D.  The 2012 BiOp considered the future declines in the leatherback sea turtle populations and the effect of other fisheries when determining the potential harm to the leatherback sea turtle from the ongoing operation of the groundfish fishery. ...................................... 20

E.   No Remedy is Appropriate But Even if One Were Plaintiffs' Request for Vacatur is Not.
................................................................................................................23

CONCLUSION ................................................................................................... 24

1

## <u>TABLES OF AUTHORITIES</u>

2

**Case**                                                                                                                  **Page(s)**

3

4
*Alaska v. Lubchenco*,
   723 F.3d 1043 (9th Cir. 2013) .................................................................................................. 9

5
*Alliance for the Wild Rockies v. Probert* ,
6
   412 F.Supp. 3d 1188 (D. Mont. 2019)................................................................................... 14

7
*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ............................................................................................... 23

8
*Am. Oceans Campaign v. Daley*,
9
   183 F.Supp.2d 1 (D.D.C.2000)............................................................................................... 20

10
*Cal. Cmtys. Against Toxics v. EPA*,
   688 F.3d 989 (9th Cir. 2012) .................................................................................................. 23

11
*Center for Biological Diversity v. Ross*,
12
   2019 U.S. Dist. LEXIS 220065 (N.D. Cal. Dec. 20, 2019)..................................................... 22

13
*Conservation Law Foundation v. Ross*,
   422 F. Supp. 3d 12 (D.D.C. 2019)......................................................................................... 16

14
*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
15
   698 F.3d 1101 (9th Cir. 2012) ................................................................................................ 21

16
*Earth Island Inst. v. Carlton*,
17
   626 F.3d 462 (9th Cir. 2010) ................................................................................................... 8

18
*Forest Guardians v. Johanns*,
   450 F.3d 455 (9th Cir. 2006) ................................................................................................. 14

19
*Great Old Broads for Wilderness v. Kimbell*,
20
   709 F.3d 836 (9th Cir. 2013) ........................................................................................... 12, 18

21
*Idaho Dep't of Fish & Game v. National Marine Fisheries Service*,
   56 F.3d 1071 (9th Cir. 1995) ................................................................................................. 10

22
*Marsh v. Or. Nat. Res. Council*,
23
   490 U.S. 360 (1989).................................................................................................................. 8

24
*National Family Farm Coalition v. U.S. EPA*,
25
   966 F.3d 893 (9th Cir. 2020) ................................................................................................. 23

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
 524 F.3d 917 (9th Cir. 2008) ................................................................................ 21

*Oceana, Inc. v. Ross*,
 No. 15-cv-0555 (PLF), 2020 WL 5995125 (D.D.C. Oct. 1, 2020) ......................... 23

*Pac. Coast Fed'n of Fishermen's Assn's v. U.S. Bureau of Reclamation*,
 226 Fed. Appx. 715 (9th Cir. 2007) ........................................................................ 9

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
 426 F.3d 1082 (9th Cir. 2005) ............................................................................... 21

*S. Utah Wilderness All. v. Smith*,
 110 F.3d 724 728-29 (10th Cir. 1997) ................................................................... 10

*Selkirk Conservation All. v. Forsgren*,
 336 F.3d 944 (9th Cir. 2003) ................................................................................... 8

*Turtle Island Restoration Network v. U.S. Department of Commerce*,
 878 F.3d 725 (9th Cir. 2017) ........................................................................... 21, 22

*United Cook Inlet Drift Ass'n v. NMFS,*,
 *2022* WL 2222879 (D. Alaska June 21, 2022) ....................................................... 3

*Wallis v. IndyMac Fed. Bank*,
 717 F.Supp.2d 1195 (W.D. Wash. 2010) ................................................................. 9

**Statutes**

5 U.S.C. § 706 ................................................................................................................ 4

5 U.S.C. § 706(2)(A) .................................................................................................. 4, 8

16 U.S.C. § 1536(a)(2) .................................................................................................. 2

16 U.S.C. § 1536(b)(4)(C)(i)-(ii) .................................................................................. 2

16 U.S.C. § 1536(o)(2) .................................................................................................. 3

16 U.S.C. § 1801 ........................................................................................................... 3

16 U.S.C. § 1852(a) ...................................................................................................... 3

16 U.S.C. § 1852(a)(1)(F) ............................................................................................. 3

16 U.S.C. § 1852(h)(1) ............................................................................................. 3, 4

16 U.S.C. § 1853 ............................................................................................................... 3

16 U.S.C. § 1853(a)(1)(A) .................................................................................................. 3

16 U.S.C. § 1853(c) ........................................................................................................... 4

16 U.S.C. § 1854 ........................................................................................................... 4, 10

16 U.S.C. § 1854(a)-(c) ..................................................................................................... 3

16 U.S.C. § 1855(f) ........................................................................................................... 4

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................. 2

**Regulations**

50 C.F.R. § 226.207 .......................................................................................................... 4

50 C.F.R. § 402.16 ............................................................................................................ 8

50 C.F.R. § 402.01(b) ....................................................................................................... 2

50 C.F.R. § 402.14(a) ....................................................................................................... 2

50 C.F.R. § 402.14(h) ....................................................................................................... 2

50 C.F.R. § 402.14(i) ........................................................................................................ 2

50 C.F.R. § 402.14(i)(6) .................................................................................................... 3

50 C.F.R. § 402.16(a) ....................................................................................................... 3

50 C.F.R. § 660.1 .............................................................................................................. 5

50 C.F.R. § 660.10 ............................................................................................................ 5

50 C.F.R. § 660.11 ........................................................................................................ 5, 14

50 C.F.R. § 660.11(5) ....................................................................................................... 5

**Federal Register**

35 Fed. Reg. 8,491 (June 2, 1970) ................................................................................... 4

1

43 Fed. Reg. 43,688 (Sept. 26, 1978) ................................................................................. 4

2

44 Fed. Reg. 17,710 (Mar. 23, 1979) .................................................................................. 4

3

77 Fed. Reg. 4,170 (Jan. 26, 2012) .................................................................................... 4

4

86 Fed. Reg 21,082 (Apr. 21, 2021) ................................................................................. 20

5

87 Fed. Reg. 77,007 (Dec. 16, 2022) .................................................................................. 5

6

88 Fed. Reg. 83,830 (Dec. 1, 2023) ................................................................................... 1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| EEZ | Exclusive Economic Zone |
| ESA | Endangered Species Act |
| FMP | Fishery Management Plan |
| FWS | U.S. Fish and Wildlife Service |
| ITS | Incidental Take Statement |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| NMFS | National Marine Fisheries Service |
| PCE | Primary Constituent Elements |
| RCA | Rockfish Conservation Area |

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF THE ISSUES

Plaintiffs challenge a final rule issued by the National Marine Fisheries Service ("NMFS") implementing an amendment to the Pacific Coast Groundfish Fishery Management Plan ("Groundfish FMP") to allow fishery access, including for vessels in the sablefish pot fishery, to areas that were previously closed to groundfish fishing to protect certain vulnerable rockfish species. *See* 88 Fed. Reg. 83,830 (Dec. 1, 2023), AR0002071-2101 ("Amendment 32" or "Final Rule").[1]  Prior to issuing the Final Rule, NMFS determined that the action was consistent with the Endangered Species Act ("ESA"), relying on the 2012 Biological Opinion ("2012 BiOp") which evaluated the effect of the ongoing operation of the groundfish fishery on ESA-listed species, including leatherback sea turtles—the species at issue in this case.

At the outset, the Court should dismiss Plaintiffs' complaint as moot because their requested relief—the reinitiation and completion of consultation for the leatherback sea turtle—will be accomplished by November 30, 2024, shortly after the oral argument scheduled for the Parties' summary judgment motions.  Alternatively, if the Court reaches the merits, it should uphold the Final Rule because Plaintiffs' arguments largely ignore the analysis in the 2012 BiOp and NMFS's support of Amendment 32 in the administrative record.  For these reasons, the Court should grant Defendants' cross-motion for summary judgment.

---

[1] Citations to the administrative record include the prefix "AR" followed by the numbered portion of Bates number, omitting the prefix "NOAACBD." The cited records are attached to this cross-motion as Exhibits A-J.

# STATUTORY AND REGULATORY BACKGROUND

## A. Endangered Species Act

### 1. Consultation and Reinitiation of Consultation

Section 7(a)(2) of the ESA requires federal action agencies to ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). If the action agency determines its proposed action "may affect" listed species or critical habitat, then it consults with the appropriate expert consulting agency to, among other things, analyze the potential impacts on ESA-listed species and their critical habitat. 50 C.F.R. § 402.14(a).[2] The agencies undertake formal consultation if the consulting agency determines the action is "likely to adversely affect" listed species or critical habitat, which culminates in the issuance of a biological opinion ("BiOp") by the consulting agency. *Id.* § 402.14(h).

If a consulting agency's BiOp concludes that the proposed action is not likely to jeopardize a listed species or adversely modify its critical habitat, but is reasonably certain to result in take, it issues an incidental take statement ("ITS") that specifies the amount or extent of the anticipated take and any reasonable and prudent measures it "considers necessary or appropriate" to minimize the impact of the take. 16 U.S.C. § 1536(b)(4)(C)(i)-(ii); 50 C.F.R. § 402.14(i). The ESA states that "any taking that is in compliance with the terms and conditions specified in [the ITS] . . . shall not be considered to be a prohibited taking of the species

---

[2] The consulting agency will be either NMFS or the U.S. Fish and Wildlife Service ("FWS"), as appropriate. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b). Here, NMFS West Coast Region Protected Resources Division is the consulting agency, and NMFS West Coast Region Sustainable Fisheries Division is the action agency.

1  concerned." 16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. § 402.14(i)(6).

2      After ESA consultation is complete, an action agency must reinitiate consultation where

3  discretionary federal involvement or control over the action has been retained or is authorized by

4  law and: (a) the amount or extent of taking specified in the incidental take statement is exceeded;

5  (b) new information reveals effects of the action that may affect listed species or critical habitat

6  in a manner or to an extent not previously considered; (c) the identified action is subsequently

7  modified in a manner that causes an effect to the listed species or critical habitat that was not

8  considered in the biological opinion; or (d) a new species is listed or critical habitat designated

9  that may be affected by the identified action.  50 C.F.R. § 402.16(a).

10  ## B. Magnuson-Stevens Fishery Conservation and Management Act

11      The MSA, 16 U.S.C. §§ 1801 *et seq*., establishes a national program for conservation and

12  management of fishery resources. NMFS, acting under authority delegated from the Secretary of

13  Commerce, is responsible for managing fisheries pursuant to the MSA.

14      Regulation of fisheries is accomplished through fishery management plans and plan

15  amendments (hereinafter, collectively referred to as "FMPs") and implementing regulations.  *Id*.

16  §§ 1852(h)(1), 1853, 1854(a)-(c). The MSA sets forth required provisions for FMPs, including

17  that FMPs must contain measures "necessary and appropriate for the conservation and

18  management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect,

19  restore, and promote the long-term health and stability of the fishery."  *Id*. § 1853(a)(1)(A).

20  To assist in fishery management, the MSA established regional fishery management councils.

21  16 U.S.C. § 1852(a).  The Pacific Fishery Management Council ("Council") advises NMFS on

22  fisheries seaward of Washington, Oregon, and California, including the groundfish fishery.  *Id.* §

23  1852(a)(1)(F).  Councils are "simply advisory bodies and have no legal authority."  *United Cook*

*Inlet Drift Ass'n v. NMFS*, 2022 WL 2222879, at *19 (D. Alaska June 21, 2022).   The Council prepares and submits to NMFS an FMP "for each fishery under its authority that requires conservation and management," as well as proposed regulations that the Council "deems necessary or appropriate" to implement the FMP.  16 U.S.C. §§ 1852(h)(1), 1853(c).  NMFS must ensure that FMPs and implementing regulations meet the requirements of the MSA and "other applicable law," such as the ESA.  *Id.* § 1854.

Section 305(f) of the MSA, *id.* § 1855(f), adopts the standard of review set forth in the Administrative Procedure Act ("APA") at 5 U.S.C. § 706.  Regulations promulgated by the Secretary may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

On June 2, 1970, the leatherback sea turtle was listed as endangered throughout its entire range under the Endangered Species Conservation Act of 1969, a precursor to the ESA.  35 Fed. Reg. 8,491 (June 2, 1970).  Since the species' listing in 1970, NMFS has designated and revised the critical habitat for the leatherback sea turtle to include areas off the coasts of California, Oregon, and Washington.  43 Fed. Reg. 43,688 (Sept. 26, 1978); 44 Fed. Reg. 17,710 (Mar. 23, 1979); 77 Fed. Reg. 4,170 (Jan. 26, 2012).  Leatherback sea turtle critical habitat includes approximately 16,798 square miles (43,798 square kilometers) stretching along the California coast and approximately 25,004 square miles (64,760 square kilometers) stretching from Cape Flattery, Washington, to Cape Blanco, Oregon. 50 C.F.R. § 226.207; 77 Fed. Reg. at 4170.

The Groundfish FMP provides a framework to manage the groundfish fishery, which is a year-round fishery that occurs off the West Coast.  The groundfish fishery includes both recreational and commercial fishing with various gear types to harvest over 90 species of

groundfish, including sablefish—an important commercial species—which is caught by vessels using either trawl gear or non-trawl gear, such as "fixed gear" including "pot" or "trap" gear.[3] 50 C.F.R. § 660.1; *id.* § 660.11(5). Vessels fish for sablefish with fixed gear in three distinct commercial sectors.[4] AR0012887. What is referred to as the "sablefish pot gear fishery" includes vessels fishing with pot/trap gear in all three sectors. NMFS, with advice of the Council, manages the fishery through setting harvest levels and management measures, including the amount of fishing allowed, and where and how that fishery can occur. *See*, *e.g.*, 87 Fed. Reg. 77,007 (Dec. 16, 2022).

NMFS, with the advice of the Council, can also manage groundfish fisheries by establishing conservation areas—an "enclosed geographic area defined by coordinates expressed in degrees latitude and longitude where NMFS may prohibit fishing with particular gear types." 50 C.F.R. § 660.11. One type of conservation area known as a Groundfish Conservation Area allows NMFS to control catch of groundfish or protected species. *See id.* § 660.11. A Rockfish Conservation Area ("RCA") is a depth-based type of Groundfish Conservation Area that specifically restricts fishing based on gear type. *Id.* In 2002, NMFS established the Non-Trawl RCA, a coastwide, contiguous area along the West Coast of the U.S., which is bounded by the Exclusive Economic Zone ("EEZ") or specific latitude and longitude coordinates that

---

[3] Non-trawl gear simply refers to "all legal commercial groundfish gear other than trawl gear" and includes fixed gear. 50 C.F.R. § 660.11. "Fixed gear" is a general term that encompasses many types of fishing gear, including: "longline, trap or pot, set net, and stationary hook-and-line (including commercial vertical hook-and-line) gears." *Id.* "Pot" gear is "a portable, enclosed device with one or more gates or entrances and one or more lines attached to surface floats." *Id.* § 660.10.

[4] The three commercial sectors are: the limited entry fixed gear fishery sector, open access fishery sector, and shorebased individual fishing quota gear switching fishery sector. AR0012887.

approximate depth contours along the West Coast continental shelf and around select islands off Southern California.  AR0002072.  The Non-Trawl RCA was intended to protect certain overfished rockfish species by closing areas to commercial fishing with non-trawl gear.  *Id*.  While the purpose of the Non-Trawl RCA was not designed to mitigate impacts to habitat, an ancillary benefit was habitat protections.  AR0001917.  A portion of the Non-Trawl RCA overlaps with designated critical habitat of the leatherback sea turtle.  AR0001880.

Pursuant to its duties under the ESA, in 2012, NMFS consulted on the effects of the continuing operation of the groundfish fishery on listed species, including the leatherback sea turtle and its critical habitat.  AR0000484-682.   In the 2012 BiOp, NMFS estimated that an average of 0.38 leatherback sea turtles per year were entangled by the sablefish pot gear fishery with a maximum of 1 single turtle entangled in a single year.  AR000611.  In issuing the 2012 BiOp, NMFS determined that the continued operation of the fishery was not likely to jeopardize the continued existence of the leatherback sea turtle or destroy or adversely modify its designated critical habitat.  AR0000484, 0000607.  Finding that incidental take of leatherback sea turtles was expected to occur as a result of entanglement with fishing gear in the sablefish pot gear fishery, NMFS issued an ITS exempting the incidental take of leatherback sea turtles at a five-year average of 0.38 injuries or mortalities per year, and up to one leatherback sea turtle injury or mortality in a single year.  AR000611. There have been no observed takes of leatherback turtles in any groundfish fishery since 2008—meaning the groundfish fishery has operated for *almost two decades* without a documented entanglement.  AR0001661.  The most recent bycatch reports of the fishery state that "interactions between leatherback sea turtles and U.S. West Coast groundfish vessels are extremely rare," and that there have been no leatherback sightings reported by fishery observers during the operation of the groundfish fishery since 2014, and only

five leatherbacks sighted in total over the last 18 years.  AR0001434.

As of July 2022, almost all of the groundfish species that the Non-Trawl RCA was intended to protect have been rebuilt, with the remaining species (yelloweye rockfish) projected to be rebuilt by 2029.  AR0001917.  With the purpose of the closures having been achieved, NMFS and the Council undertook an extensive multi-year process to consider area management modifications and increase fishing access for groundfish non-trawl fisheries.  AR0001916.  On December 1, 2023, NMFS published the Final Rule implementing regulations for Amendment 32 to the Groundfish FMP, which included a suite of modifications to the groundfish fishery.  AR0002071.  As relevant to this litigation, the regulations implemented modifications to the Non-Trawl RCA to allow non-trawl commercial fishing in a portion of the area that was previously closed to groundfish fishing.  *Id.*  Among other things, the Final Rule moved the seaward boundary of the Non-Trawl RCA closer to shore, opening approximately 2,411 square miles off Oregon and California to all non-trawl commercial groundfish sectors, including vessels fishing in the sablefish pot gear fishery.  AR0002072.  Given that a portion of the Non-Trawl RCA being opened to fishing overlaps with designated critical habitat for leatherback sea turtles, NMFS and the Council considered the effect of Amendment 32 on leatherback sea turtles and evaluated the action consistent with obligations under the MSA, ESA, and the National Environmental Policy Act. As relevant to this litigation, NMFS "determined there are no anticipated impacts on ESA-listed leatherback sea turtles beyond those impacts already considered in the 2012 Biological Opinion and therefore re-initiation [as a result of Amendment 32] is not warranted." AR0002078.

On March 26, 2024, the Assistant Regional Administrator for Sustainable Fisheries Division of NMFS West Coast Region issued a memorandum to the Assistant Regional

Administrator for Protected Resources Division of NMFS West Coast Region requesting

voluntary reinitiation of the Section 7 consultation under the ESA ("Memorandum") on the

continued operation of the groundfish fishery for the leatherback sea turtles.  AR0002116-26.

The Memorandum explained that the reinitiation was voluntary because none of the regulatory

triggers under 50 C.F.R. § 402.16 had been met, but outlined the reasons the agency was

choosing to reinitiate.[5]  AR0002116-17.  NMFS noted that it had reinitiated consultation on the

continued operation of the Groundfish FMP for ESA-listed humpback whales and their

designated critical habitat, finding that completion of concurrent consultation for both the

humpback whales and the leatherback sea turtle would be an efficient use of NMFS's limited

resources due to similarities in entanglement risks.  AR0002123.

**STANDARD OF REVIEW**

The APA provides that a reviewing court may set aside "agency action, findings,

and conclusions" only if it finds them to be "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Earth Island Inst. v. Carlton*,

626 F.3d 462, 468 (9th Cir. 2010).  Review under this standard is deferential, with a presumption

in favor of finding the agency action valid especially in areas involving a "high level of technical

expertise." *Selkirk Conservation All. v. Forsgren,* 336 F.3d 944, 954 (9th Cir. 2003) (quoting

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377-78 (1989)).

---

[5] Plaintiffs incorrectly assert that NMFS intended the reinitiation memo to "cure its MSA violations." Pls.' Br. at 22.  This is simply inaccurate. NMFS met its MSA obligations, including consistency with the ESA, in issuing the Final Rule.  *Separately*, NMFS has made the decision to reinitiate. The Memorandum documents why the agency was not required to reinitiate but why the agency has voluntarily chosen to reinitiate consultation.  *See* AR0002116-24.

1

**ARGUMENT**

2

**A. Because reinitiation of consultation has commenced and will be completed shortly, Plaintiffs' remaining claim is moot.**

3

4

Plaintiffs' remaining claim that NMFS failed to comply with the MSA by failing to

5

"reinitiate and complete consultation" under ESA Section 7 for the leatherback sea turtle (*see*

6

ECF No. 1 ¶¶ 11, 8-100)[6] is prudentially moot and will be constitutionally moot at the end of

7

November. *Wallis v. IndyMac Fed. Bank*, 717 F.Supp. 2d. 1195, 1198 (W.D. Wash. 2010)

8

("Two varieties of mootness exist: Article II mootness and prudential mootness.").

9

In issuing MSA regulations for Amendment 32, NMFS determined that the action was

10

within the scope of the 2012 BiOp and there were no impacts to listed species or critical habitat

11

beyond those already considered; therefore, the action did not trigger reinitiation of ESA

12

consultation. AR0002978.  However, as reflected in the declaration of Daniel Lawson ("Lawson

13

Decl."), NMFS voluntarily reinitiated consultation to efficiently use agency resources and to

14

consider changes the Council has recommended to the groundfish fishery, including gear

15

marking.  Lawson Decl. ¶ 3.  Plaintiffs admit in their briefing that NMFS "must evaluate the

16

effect of the fishing plans on the [endangered species] and its habitat," Pls.' Br. at 11 (quoting

17

*Alaska v. Lubchenco*, 723 F.3d 1043, 1048 (9th Cir. 2013)), and that this process culminates in

18

the "'develop[ment of] a comprehensive, up-to-date biological opinion,'" *id.* at 11 (*citing Pac.*

19

*Coast Fed'n of Fishermen's Assn's v. U.S. Bureau of Reclamation*, 226 Fed. Appx. 715, 717–18

20

(9th Cir. 2007). NMFS is doing just that in the current ESA consultation. NMFS is evaluating the

21

22

[6] In their complaint, Plaintiffs requested that the Court order Federal Defendants "to implement mitigation measures to reduce the Pot Fishery's impacts to leatherback sea turtles and their critical habitat pending completion of consultation," ECF No. 1 at 22, but appear to have abandoned this request in their brief.  *See* Pls.' Br. at 33.

23

24

25

impacts of the ongoing operation of the groundfish fishery, which includes changes to the fishery made by regulations implementing Amendment 32 to the Groundfish FMP.  Lawson Decl. ¶ 4. NMFS anticipates issuing its biological opinion and, if appropriate, an ITS by November 30, 2024.  *Id*.  Consultation is expected to be complete just five days after briefing and oral argument in this case have concluded.  *See* ECF Nos. 45, 49.  Thus, even if Plaintiffs' arguments about Amendment 32 had merit (which Federal Defendants dispute), there is no dispute that completion of consultation will resolve any ESA and thereby any MSA violation and leave Plaintiffs with no remaining avenue for relief. *See Idaho Dep't of Fish & Game v. National Marine Fisheries Service*, 56 F.3d 1071, 1075 (9th Cir. 1995) (superseding biological opinion moots claims relating to earlier opinion); *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 728-29 (10th Cir. 1997) (agreeing with the district court's determination that subsequent consultation under the ESA mooted plaintiffs' claim that the agency failed to seek consultation prior to implementing the action).

For these reasons, Plaintiffs' remaining claim should be dismissed as moot.

**B.    NMFS complied with the MSA and the ESA in issuing the Final Rule.**

If the Court reaches the merits, it should grant summary judgment for Defendants on the MSA claim because, at the outset, Plaintiffs are simply mistaken in their contention that NMFS "issued the [regulations implementing Amendment 32] without consulting on the impacts to leatherback sea turtles and their critical habitat as the Endangered Species Act ('ESA') requires" Pls.' Br. at 1.  NMFS complied with the MSA and the requirement to evaluate "regulations to determine whether they are consistent with…other applicable law", including the ESA.  16 U.S.C. § 1854.  The crux of Plaintiffs' arguments is that NMFS relied on the "outdated" 2012 BiOp when reopening areas to commercial groundfish fishing under Amendment 32.  Pls.' Br. at

3.  But a plain reading of the 2012 BiOp reflects consideration of the factors that affect the leatherback sea turtle or its critical habitat as a result of the ongoing operation of the groundfish fishery.  AR0000592-93.  NMFS determined that Amendment 32, which, as relevant here, included reopening portions of the Non-Trawl RCA to fishing with sablefish pot gear, was within the scope of the effects to ESA-listed leatherback sea turtles considered in the 2012 BiOp. AR0002078.  The 2012 BiOp evaluated the potential effects of the continuing implementation of the Groundfish FMP (i.e., the ongoing operation of the groundfish fishery) on leatherback sea turtles based on the best scientific information available.  It used this information and data to describe the status of leatherback sea turtles and develop the environmental baseline, including information on fisheries bycatch, ship collisions, entanglement and ingestion of marine debris, the impact of human activities on the species, and prey availability.  AR0000568-70.  And NMFS outlined these considerations in its analysis to evaluate whether the effects of injuries and mortalities from groundfish fishing on the U.S. West Coast – including sablefish pot gear fishing—may reduce the reproduction, numbers, or distribution of leatherback sea turtles sufficient to trigger the regulatory definition of jeopardy.  AR0000592.  Using this information, the agency estimated the annual number of leatherback sea turtle injuries and mortalities caused by the ongoing operation of the groundfish fishery after acknowledging and accounting for uncertainty in the number of past entanglements attributed to pot gear from unidentified fisheries.  *Id*.

**C.  NMFS complied with the MSA and ESA in determining that Amendment 32 did not require reinitiation of consultation for the leatherback sea turtle or its critical habitat because there were no anticipated impacts of Amendment 32 beyond those considered in the 2012 BiOp.**

NMFS used its expertise, along with the best available information, to conclude that Amendment 32 would have no impacts on leatherbacks or their critical habitat to a degree or in a

Federal Defendants' Memorandum in Support                                        11
3:23-cv-06642-AMO

manner not considered in the 2012 BiOp and therefore reinitiation of consultation as a result of

the action was not warranted.  Plaintiffs argue that the reopening of portions of the Non-Trawl

RCA along the California and Oregon coast to sablefish pot gear fishing would lead to "dire

consequences" and that the increased potential entanglements resulting from this reopening

triggered NMFS's legal duty to reinitiate consultation.  But, as described above, such alarmist

assertions are belied by the record.  And, as described below, the record reflects that the agency's

interpretation of the current data regarding leatherback sea turtle entanglements and sightings is

reasoned, supported by the record, and thus entitled to deference by this Court.  *Great Old*

*Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846 (9th Cir. 2013) ("A reviewing court must

be at its most deferential when reviewing scientific judgments and technical analyses within the

agency's expertise." (cleaned up)).

   **1. NMFS considered the geographic expansion from Amendment 32 of the area in which sablefish pot gear fishing is allowed to occur.**

   Plaintiffs incorrectly argue that because Amendment 32 opened large geographic areas to

sablefish pot gear fishing that were not evaluated for potential fishing impacts in the 2012 BiOp,

NMFS was required to reinitiate consultation.  Pls.' Br.  at 12-13.  While Plaintiffs are correct

that the groundfish fishing area off the California coast has expanded, as discussed above, NMFS

fully considered the potential impacts resulting from the area expansion during the Amendment

32 rulemaking process and found that Amendment 32 would not increase the risk of leatherback

sea turtle entanglements or affect critical habitat to an extent beyond that considered in the 2012

BiOp.  *See* Argument B, *supra.*

   Plaintiffs first argue that because the operation of the groundfish fishery in 2012 included

areas closed to groundfish fishing, reopening some of these areas means that "on its face" NMFS

could not have met its ESA obligations in issuing the Final Rule without reinitiating

consultation.  Pls.' Br. at 13.  This is a misunderstanding of the 2012 BiOp and NMFS's ESA

obligations.  The proposed action in the 2012 BiOp was the ongoing operation of the groundfish

fishery; this included areas that were closed to protect overfished groundfish.  While leatherback

sea turtles would not be exposed to pot gear in the closed areas in 2012, in the 2012 BiOp NMFS

did not base its effects analysis and "no jeopardy" determination for sea turtles on the occurrence

of these protected areas.  AR000592; AR000594.  Plaintiffs misrepresent the 2012 BiOp in

alleging that, because the description of the action area provides that the area where fishing has

occurred through 2010 is where direct effects to ESA-listed species are likely to occur, only the

effect of fishing in those areas could be considered.  Significantly, Plaintiffs leave out that the

description of the action area, e.g., "all areas to be affected directly or indirectly by the Federal

action", extends to the entire West Coast EEZ.  AR000519. As noted in the remainder of the

2012 BiOp, while area closures can limit fishing, NMFS did not base its effects analysis on the

occurrence of these protected areas. AR000499; AR000592; AR000594.  Rather, the 2012 BiOp

analyzed the effects of the ongoing operation of the groundfish fishery as a whole, including an

analysis of the best scientific information available on not only where fishing was then

occurring, but also on fisheries bycatch, ship collisions, entanglement and ingestion of marine

debris, prey availability, historical sightings, and entanglements with fishing gear. AR0000568-

70.

The cases offered by Plaintiffs do not undermine the 2012 BiOp's analysis or its

conclusions, nor do they imply that Amendment 32 triggered reinitiation.  Rather, the cases

offered simply provide that actions that are significant deviations from actions analyzed in an

agency evaluation cannot be covered by that prior evaluation.  Claims that Amendment 32 and

the 2012 BiOp fit into this category are inapposite.  Pls.' Br. at 13.  For one, the Ninth Circuit's

decision in *Forest Guardians v. Johanns*, 450 F.3d 455, 465 (9th Cir. 2006) dealt with excessive utilization of a grazing allotment.  In this case, there is no evidence of excessive entanglements above that contemplated by the 2012 BiOp—a point which Plaintiffs concede.  Pls.' Br. at 12, n.3.  Likewise, *Alliance for the Wild Rockies v. Probert*, 412 F.Supp. 3d 1188 (D. Mont. 2019) found modification of the original action based on multiple ineffective road closures that resulted in increases in baseline mileage levels that were not considered in the original BiOp.  But here NMFS determined that the reopened areas would have no increased entanglement risk for leatherbacks beyond those considered in the 2012 BiOp.  Indeed, as discussed above, Plaintiffs do not demonstrate that Amendment 32 resulted in impacts on leatherbacks or their critical habitat to a degree or in a manner not considered in the 2012 BiOp.

Further, Plaintiffs' extreme arguments ignore that the groundfish fishing closures were not established for the purposes of protecting leatherback sea turtles (or other protected species) but rather to protect certain overfished rockfish from fishing.  *See* 50 C.F.R. § 660.11.  Thus, there are no protections that were implemented specifically for leatherback sea turtles that are being undone by the reopening through the Final Rule. And the best available information suggests leatherback interactions with the groundfish fishery are "extremely rare." AR0002118. In sum, in promulgating Amendment 32, NMFS did consider the conservation areas in place in 2012 and why those areas were in place—*i.e.*, for *rockfish* which no longer need the protections of the Non-Trawl RCA—in its analysis and conclusions.  Additionally, and importantly, NMFS considered whether there was any information to indicate that Amendment 32 would result in fishery changes that would have an impact on *leatherback sea turtles* beyond those considered in the 2012 BiOp.  And, based on the fact that there have been no entanglements since the 2012 BiOp has been issued (AR0002078), minimal sightings of leatherbacks (AR0001430-31), and

1    shifts in fishery effort northward to Oregon (AR0001605), the record supports NMFS's

2    conclusion during the Amendment 32 rulemaking process that the likelihood of the sablefish pot

3    gear fishery affecting leatherback sea turtles is low, and that the reopening of fishery areas would

4    not cause impacts beyond those considered in the 2012 BiOp.

5         Second, Plaintiffs argue that, despite NMFS typically relying on the spatial overlap

6    between the sablefish pot gear fishery and areas where leatherback sea turtles may be present to

7    determine entanglement risk, its entanglement findings for Amendment 32 were solely reliant on

8    the amount of fishing gear in the water.  Pls.' Br. at 14.  But Plaintiffs are incorrect and rely on

9    their own erroneous assumptions and interpretation of the scientific evidence in the record in

10   making this argument.  First and foremost, in the 2012 BiOp, NMFS did consider spatial overlap,

11   but it also considered other factors to assess entanglement risk: distribution, nesting aggregation,

12   migration aggregation, foraging areas, seasonality, historical entanglements, observer data

13   (accounting for uncertainty), and anticipated takes in other fisheries.  AR0000546-48, 0000568-

14   69, 0000605-06;[7] AR0002118-19.  Importantly, by reopening areas within the Non-Trawl RCA

15   to fishing, in its analysis supporting Amendment 32 NMFS anticipated that the density of gear in

16   the water was likely to decrease because the same number of vessels that fish in the fishery

17

18   _____

19   [7] Plaintiffs misconstrue a quotation in the Final Rule to suggest that NMFS made a general
     finding that geographic expansion of fishing areas does not significantly increases risk of

20   entanglement.  See Pls.' Br. at 14-15 ("[T]here is no evidence to suggest that a geographic
     expansion of fishery effort . . . significantly increases the risk of entanglement to leatherback sea

21   turtles").  However, the entirety of the quote was based on a specific analysis of Amendment
     32's reopened fishing areas and reads: "Additionally, there is no evidence to suggest that a

22   geographic expansion of fishery effort (not an increase in fishing effort) into the area being
     opened significantly increases the risk of entanglement to leatherback sea turtles." AR0002078

23   (emphasis added).  Thus, NMFS made specific findings as to the areas being opened under
     Amendment 32 and not a general proposition regarding geographic expansion, as Plaintiffs

24   appear to incorrectly allege.

25

1    would be spread across a larger area (and thus spread out the number of pots used and buoy lines

2    in the water).[8]  AR0001983.[9]

3    Next, Plaintiffs assert that NMFS places unfounded weight on the lack of documented

4    interaction of leatherback sea turtles with the fishery since 2008 because the agency is ignoring

5    possible interactions from "unidentified fisheries that could have also been the sablefish pot

6    fishery."  Pls.' Br. at 15.  Contrary to Plaintiffs' argument, this issue was addressed by the 2012

7    BiOp and considered by NMFS when evaluating whether Amendment 32 triggered reinitiation of

8    the 2012 BiOp.  The 2012 BiOp noted and accounted for unidentified entanglements in the

9    sablefish pot gear calculations and analysis.  AR0000592 ("The entanglements were

10   characterized as pot/trap gear from unidentified fisheries. Some of these may therefore have

11   involved pot/trap gear from proposed fishing.  Given the present uncertainties of the available

12   data, we made precautionary assumptions in our analysis to ensure the proposed fishing is not

13   likely to jeopardize the continued existence of leatherbacks").  The 2012 BiOp ITS specifically

14

15

16

17   _____

     [8] Plaintiffs characterize the impact of Amendment 32 as creating "a gauntlet of vertical lines" in
18   the water which not only result in significant increased risk of entanglement but also obstruct the
     movement of turtles in sablefish fishing areas. Pls.' Br. at 2, 19.  Amendment 32 did     not
19   increase fishing effort, nor did it concentrate fishing in certain locations. Rather, Amendment 32
     expanded the geographic area over which that fishing effort can occur, thus likely decreasing the
20   density of vertical lines in fishing areas, including areas where sea turtles forage.

21   [9] Plaintiffs cite to *Conservation Law Foundation v. Ross*, 422 F. Supp. 3d 12 (D.D.C. 2019) to
     support their argument that NMFS violated the MSA when promulgating Amendment 32. In that
22   case, the D.C. District Court found potential harm from an MSA regulation that eliminated
     fishing gear restrictions in areas inhabited by the North Atlantic Right whales.  But that case is
23   inapplicable here.  In *Conservation Law Foundation*. the plaintiffs presented expert declarations
     that included "powerful evidence, supported by extensive citation to peer-reviewed research"
24   that opening fishing areas irreparably harmed the whales.  *Id*. at 32.  In this case, Plaintiffs
     present no such evidence, other than unsupported suppositions, that Amendment 32 will increase
25   entanglement risk or risks beyond those considered in the 2012 BiOp.

     Federal Defendants' Memorandum in Support                           16
     3:23-cv-06642-AMO

accounted for potentially unidentified fishery takes.[10]  AR00000611 ("Consistent with the analysis in this biological opinion, unidentified gear entanglements reported to stranding networks would be counted against these take limits in addition to known leatherback sea turtle entanglements in gear of the proposed fishery….").

All information to date is consistent with the analysis and conclusions in the 2012 BiOp. The record supports that there have been four entanglements of leatherbacks in pot fishing gear since 2012—none of which were in the sablefish pot gear fishery.  The four entanglements are as follows: 1) a live leatherback entangled in commercial Dungeness crab gear off the coast of central California in 2016 (AR0001498; AR0001442); 2) a dead leatherback entangled in rock crab gear off the coast of Southern California in 2019 (AR0001498; AR0001442); 3) a dead leatherback entangled in Dungeness crab fishing gear of the coast of central California in 2023 (AR0002112); and 4) a dead leatherback entangled in unidentified gear off the coast of central California (AR0001498; AR0001442). As noted in its decision to voluntarily reinitiate, NMFS considered the 2015 entanglement as an unidentified entanglement for purposes of determining if the ITS from the 2012 BiOp was exceeded. However, the evidence indicates it is unlikely that this entanglement is attributed to the sablefish pot gear fishery. AR 0002123 ("Nonetheless, although we cannot confidently identify the origin or completely discount the groundfish fishery as a possible origin of this entanglement, the gear configuration using the bullet buoys documented is different than the common configurations known to be used in the sablefish pot gear fishery….").

---

[10] And Plaintiffs acknowledge that there were not any such relevant takes by conceding in their brief that the ITS had not been exceeded.  *See* Pls.' Br. at 12.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Finally, Plaintiffs incorrectly conflate the 2012 BiOp's reasonable and prudent measures regarding observer coverage and NMFS's analysis and assumptions regarding uncertainty due to low observer coverage.  Pls.' Br. at 15-16.  The 2012 BiOp directly accounts for uncertainty in the data and takes "precautionary" and conservative approaches that accounts for both observed and *unidentified* takes to address jeopardy and in determining the take thresholds in the ITS.  *See* AR000592, 0000611.  The take thresholds, which continue to apply to the fishery, do account for the uncertainty due to the lack of complete data.  By determining that the fishery has not exceeded the ITS since the 2012 BiOp was issued (a point Plaintiffs now concede), NMFS *did* appropriately consider the data in light of low observer coverage, and the agency's interpretation of the current data is entitled to deference by this Court.  *Great Old Broads for Wilderness*, 709 F.3d at 846 ("A reviewing court must be at its most deferential when reviewing scientific judgments and technical analyses within the agency's expertise." (cleaned up)).

Plaintiffs next allege that NMFS ignored the importance of the leatherback critical habitat's foraging areas in issuing Amendment 32.  Pls.' Br. at 16-17.  In particular, Plaintiffs argue that NMFS discounted two specific areas of leatherback sea turtle critical habitat off California (Area 1 and Area 7) when considering the impacts from reopening portions of the Non-Trawl RCA to sablefish pot gear fishing.  *Id.*  But Plaintiffs'  arguments essentially rehash prior arguments that Amendment 32 adds additional entanglement risk and impacts to leatherbacks that were not considered in the 2012 BiOp, meanwhile ignoring NMFS's direct analysis of the effect of the fishery on leatherback sea turtle foraging grounds. AR0000547-49; AR0000606. Additionally, and importantly, Amendment 32 was not novel in allowing sablefish pot gear fishing in portions of leatherback critical habitat.  Rather, as is illustrated in Figure 3 in Plaintiffs' brief, Pls'. Br. at 18, the portion of the Non-Trawl RCA reopened to sablefish fishing

by Amendment 32 is almost all surrounded by either leatherback critical habitat Area 1, Area 7 or Area 2, areas where fishing has been allowed.  Therefore, the reopening of additional areas by Amendment 32 is likely to shift effort from one of these critical habitat areas to another, rather than create a new type of impact in a new (or more important) component of the sea turtles' critical habitat.

In accusing NMFS of failing to consider foraging areas, Plaintiffs' citations only show that NMFS reopened portions of areas that overlap with foraging areas, a fact directly considered by NMFS.  *See* Pls.' Br. at 16-17.  NMFS *did* consider leatherback critical habitat, including foraging grounds, in the 2012 BiOp. AR0000547–49.  In addition, in the analysis supporting Amendment 32, NMFS specifically considered the impact of reopening portions of the Non-Trawl RCA on leatherback prey species. AR0001983. The record, and Plaintiffs' map, shows that the Non-Trawl RCA overlaps with only a portion of designated sea turtle critical habitat off of California and is surrounded by critical habitat, including areas where fishing occurred prior to 2012.  *See* Pls.' Br. at 18. Thus, NMFS anticipates that vessels that are *already fishing in areas of designated critical habitat* could move into the areas opened by Amendment 32.

Finally, Plaintiffs include a red herring implying that pot gear would "restrict movement" in critical habitat by entangling leatherbacks or preventing foraging.  Pls. Br. at 19. The 2012 BiOp did not identify sablefish pot gear as having any impact on the prey availability primary constituent element ("PCE") for leatherbacks (AR0000593), and there is no evidence in the record to suggest that such an effect to designated critical habitat exists.  Further, entanglement is considered as an effect on the species, not critical habitat. AR0000592.  Therefore, Plaintiffs are accusing NMFS of failing to meet a standard for leatherback sea turtle critical habitat that

1    Plaintiffs have invented.[11]  In the context of MSA determinations, "[c]ourts give a high degree of

2    deference to agency actions based on an evaluation of complex scientific data within the agency's

3    technical expertise." *Am. Oceans Campaign v. Daley,* 183 F.Supp.2d 1, 4 (D.D.C. 2000) (citation

4    omitted). Such deference is appropriate for NMFS's determinations here.

5        **D. The 2012 BiOp considered the future declines in the leatherback sea turtle**
6        **populations and the effect of other fisheries when determining the potential harm to**
         **the leatherback sea turtle from the ongoing operation of the groundfish fishery.**

7            Plaintiffs argue that evidence of leatherbacks' population decline constituted new

8    information not considered in the 2012 BiOp and thus required reinitiation of consultation.  Pls.'

9    Br. at 19-20.  Contrary to Plaintiffs' arguments, population declines of the leatherback sea turtle

10   since issuance of the 2012 BiOp were anticipated and do not constitute new information

11   triggering reinitiation.  The declines in the leatherback sea turtle were directly addressed by

12   NMFS in the 2012 BiOp, which reflected that the West Pacific leatherback sea turtle population

13   had been declining for several decades and generally anticipated that this trend would continue

14   into the future.  AR0000547, 0000605.  The material referenced by NMFS in the 2012 BiOp

15   addressed population declines, noting that the leatherback turtle has declined markedly during

16   past decades.  *See* AR0000547-48 (addressing abundance and productivity of the leatherbacks);

17   0010213 (2012 Risk Assessment ("Leatherbacks are seriously declining at all major Pacific basin

18   rookeries")); *see also* AR0003192-3209 (cited 1996 study addressing worldwide decline in

19   leatherback sea turtle abundance); AR0000605 ("the trend continues to decline.").  Information

20

21   ───────────────

22   [11] Plaintiffs also make a misleading contrast to humpback whales; designation of humpback
     whale critical habitat does identify prey accessibility as a PCE, e.g. an essential component of
23   critical habitat.  86 Fed. Reg 21,082, 21117 (Apr. 21, 2021).  But the leatherback sea turtle
     critical habitat designation does not include prey accessibility as an essential component.  In fact,
24   in the final rule designating critical habitat, the agency explained that it had "eliminated as a PCE
     'migratory pathway conditions to allow for safe and timely passage and access to/from/ within
25   high use foraging areas.'"  AR0000462.

1   since the 2012 BiOp show lower than anticipated effects of decline, no documented

2   entanglements in the groundfish fishery since 2008, no sightings in the groundfish fishery since

3   2014, and no indication of heightened impacts to prey—information which is consistent with the

4   analysis in the 2012 BiOp.  *See* AR0001430-31.

5          Next, Plaintiffs are incorrect that leatherback sea turtle entanglements in the Dungeness

6   crab fishery warrant reinitiation of consultation because they are new information not considered

7   in the 2012 BiOp.  Pls.' Br. at 19.[12]   The 2012 BiOp anticipated continued entanglements and

8   takes by other fisheries in its analysis, along with other human-caused mortality.  Coupled with

9   the anticipated continued decline of leatherback sea turtles, the two recent entanglements in the

10  Dungeness crab fishery are within the bounds of what NMFS anticipated would continue to

11  occur and thus, on their own, do not constitute new information that triggers reinitiation of the

12  2012 BiOp.

13         Similarly, Plaintiffs' reliance on *Turtle Island Restoration Network v. U.S. Department of*

14  *Commerce*, 878 F.3d 725 (9th Cir. 2017), to argue that NMFS ignored the cumulative risk to the

15  leatherback sea turtles due to leatherback takes in the California Dungeness crab pot fishery is

16  unpersuasive.  Pls.' Br. at 21.[13]   In that case, the Ninth Circuit found that that NMFS's finding

17

18  _____

19  [12] Plaintiffs incorrectly claim that a 2015 take of the leatherback sea turtle was caused by the
    California Dungeness crab fishery. Pls.' Br. at 20.  The take was a leatherback entanglement in
    unidentified gear commonly used in a large number of commercial and recreational fixed gear
20  fisheries.  AR0002122.  And NMFS further explains that, even when considering this
    unidentified entanglement, the 2012 ITS has not been exceeded.  AR0002123.

21

22  [13] Plaintiffs cite to several cases to support their argument, but none deal with cumulative risk
    based on takes in fisheries, and none undermine the continuing validity of the analysis in
    NMFS's 2012 BiOp.  *See* Pls.' Br. 21-23; *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S.*
23  *Bureau of Reclamation*, 426 F.3d 1082 (9th Cir. 2005) (irrigation project's short term flow
    effects on the coho salmon); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917,
24  930 (9th Cir. 2008) (proposed operations of Federal Columbia River Power System dams and
    related facilities affecting ESA-listed salmon and steelhead); *Ctr. for Biological Diversity v. U.S.*
25

1    of no jeopardy to the loggerhead sea turtle from a swordfish fishery's increased use of shallow-

2    set longline fishing was arbitrary and capricious because "NMFS improperly minimized the risk

3    of bycatch to the loggerheads' survival by only comparing the effects of the fishery against the

4    baseline conditions that have already contributed to the turtles' decline." *Turtle Island*

5    *Restoration Network*, 878 F.3d at 738.  Specifically, the Ninth Circuit found that "the agency

6    reached an arbitrary conclusion by only comparing the prospective harm to the loggerheads that

7    is attributable to the proposed action—the death of a single adult, female loggerhead per year—

8    to the much greater harm resulting from factors beyond the fishery" and ignoring the results of

9    the best available science—a climate-based model that predicted a decline in loggerhead

10   populations to a level that represented a "heightened risk of extinction." *Id*. at 737.

11          Here, unlike *Turtle Island Restoration Network*, NMFS did not restrict its analysis in the

12   2012 BiOp to the prospective harms caused by sablefish pot gear fishing but considered several

13   harms beyond the fishery such as the declines in population, total serious injury and mortality

14   from all human sources, and mortality outside of the action area.  AR0000604-05.  Further,

15   Plaintiffs have not argued—nor could they—that the agency ignored the best available science,

16   such as the climate-based model in *Turtle Island Restoration Network*.  878 F.3d. at 737.  Thus,

17   there is no evidence that NMFS ignored any "cumulative risk" to the leatherback sea turtle.[14]

18

19   _____

20   *Bureau of Land Mgmt*., 698 F.3d 1101, 1108 (9th Cir. 2012) (effect of a pipeline on various
     listed species).

21   [14]  Likewise, Plaintiffs' citation to *Center for Biological Diversity v. Ross*, 2019 U.S. Dist.

22   LEXIS 220065 (N.D. Cal. Dec. 20, 2019) is inapplicable here.  While that case involved the
     effect of a commercial fishing permit on the leatherback sea turtle, the crux of the issue was that

23   NMFS failed to account for a 2017 BiOp that contained differing estimates of the numbers of
     annual nesting female leatherbacks than in the BiOp the agency relied upon.  In the present case,

24   Plaintiffs' have not alleged that NMFS relied on inaccurate population numbers.

25

**E.  No Remedy is Appropriate But Even if One Were Plaintiffs' Request for Vacatur is Not.**

Even if the Court were to find the case is not moot, and find a violation on the merits, which it should not, Plaintiffs' contention that vacatur of Amendment 32 is required lacks merit. Pls.' Br. at 22-23   When determining whether to grant vacatur, courts should consider the seriousness of the agency's errors and the potential disruptive consequences (including environmental or economic harm) of vacatur—without applying an underlying assumption that the appropriate remedy is remand with vacatur.  *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992-94 (9th Cir. 2012) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *National Family Farm Coalition v. U.S. EPA*, 966 F.3d 893, 929 (9th Cir. 2020).  And, as described above, Plaintiffs' alleged errors, when seen in the context of NMFS's detailed analysis of the record, are not serious.  The most current evidence shows the absence of any documented take or even observation of leatherbacks in the groundfish fishery for a decade or more (2008 and 2014, respectively).  AR0001430-31.

The risk to leatherbacks from the fishery's ongoing operation, including the changes implemented under Amendment 32, is therefore very low.  And NMFS expects that the updated biological opinion will fully address Plaintiffs' alleged claims.  *Cf. Oceana, Inc. v. Ross*, No. 15-cv-0555 (PLF), 2020 WL 5995125, at *23 (D.D.C. Oct. 1, 2020) ("In its prior decisions regarding other BiOps, the Court has remanded without vacatur.  In doing so, the Court emphasized that its decision to remand without vacatur was in part because the agency might be able to justify its choices on remand.").

Plaintiffs have failed to provide any facts in the record demonstrating risk to leatherback sea turtles beyond that identified in the 2012 BiOp.  Importantly, in arguing for vacatur, Plaintiffs seem to forget that the Non-Trawl RCA was intended to protect overfished rockfish, a

Federal Defendants' Memorandum in Support                                         23
3:23-cv-06642-AMO

purpose which has been achieved.  Vacatur of the Final Rule would require NMFS to reinstate a *rockfish* area closure where there is no underlying basis under the MSA to close areas to fishing to protect rockfish. While there is ancillary habitat protection benefit from such fishing closures, here the alleged errors in reopening portions of the Non-Trawl RCA are not serious with respect to entanglement risk to leatherback sea turtles.

Contrary to Plaintiffs' allegations, vacating the rule would be disruptive. Development of Amendment 32 was an extensive multi-year process. AR0001916.  As noted in the analysis for Amendment 32, there have been coastwide declines in commercial and recreational fishing opportunities in groundfish and non-groundfish fisheries on the West Coast due to environmental conditions and management changes.  AR0001915; AR0002061. This has resulted in increased fishing restrictions creating considerable instability for fishing communities.  *Id*.  Vacatur would result in NMFS reinstating fishery closures (closures which no longer have a purpose) which would increase restrictions on an already constrained fishing community.

In sum, Plaintiffs' alleged errors are non-serious and readily addressable. In fact, NMFS fully expects any such errors to be addressed in an updated BiOp for the groundfish fishery no later than November 30, 2024. Risk to leatherbacks from Amendment 32 are very low, yet vacating Amendment 32 would have serious, disruptive consequences to the fishery. For these reasons, if the Court were to find error, vacatur of Amendment 32 would not be appropriate. Instead, the Court should refrain from granting any remedy given the imminent issuance of the updated BiOp for the groundfish fishery.

## CONCLUSION

For the foregoing reasons and the analysis presented in the administrative record, Federal Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment

1     and grant Federal Defendants' cross-motion in its entirety.

2

3     Dated:  September 18, 2024                Respectfully submitted,

4                                              TODD KIM
                                               Assistant Attorney General
5                                              S. JAY GOVINDAN
                                               Section Chief
6                                              MEREDITH L. FLAX
                                               Deputy Section Chief
7

8                                              /s/  Anthony D. Ortiz
                                               ANTHONY D. ORTIZ (DC Bar 978873)
9                                              JOSEPH W. CRUSHAM (324764)
                                               U.S. Department of Justice
10                                             Environment and Natural Resources Division
                                               Wildlife and Marine Resources Section
11                                             P.O. Box 7611, Ben Franklin Station
                                               Washington, D.C. 20044
12                                             Tel | (202) 307-1147; Fax | (202) 305-0275
                                               E-mail: Anthony.D.Ortiz@usdoj.gov
13                                             Attorneys for Federal Defendants

14

15

16

17

18

19

20

21

22

23

24

25

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

I, Anthony D. Ortiz, hereby certify that, on September 18, 2024, I caused the

foregoing to be served upon counsel of record through the Court's CM/ECF system. I

4

declare under penalty of perjury that the foregoing is true and correct.

5

6

7

*/s/ Anthony D. Ortiz*
Anthony D. Ortiz

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25